## SHOENBERGER v. MULHOLLAN.

The act of the 28th of March, 1840, entitled "A supplement to the act entitled 'an act regulating lateral railroads,'" passed on the 5th of May, 1832, extends the privilege of making and constructing lateral railroads over intervening lands, to the owner or owners of land, mills, quarries, coal or other mines, lime-kilns, or other real estate, in the vicinity of any railroad, canal, or slack-water navigation, made, or to be made hereafter, by any company, individuals, or by the state of Pennsylvania, to each and every county in the state.

Although the acts of Assembly do not authorize any one but the owner or owners of land, in the vicinity of any railroad, canal, or slackwater navigation, to make lateral railroads over the intervening lands of others; yet, where a petitioner for a lateral railroad, from his coal-mine, over intervening land, to the Alleghany Portage railroad, proved that he was in possession of the coal-mine, and of the tract of. land on which it was, previously to, and at the time of the commencement of the proceeding; and that he had built thereon a two-storied dwelling-house, which had been in actual occupation from the time of its erection: it was *held*, that he had established an equitable title in himself subject to all the incidents of a legal estate, and amply sufficient for the purposes of the proceeding.

The lateral railroad act is constitutional: Harvey *v.* Lloyd, 3 Barr, 331.

IN error from the Court of Common Pleas of Blair county.

*May* 22.   This was a feigned issue, formed under the direction of the court below, under the act of the 5th of May, 1832, entitled "An act regulating lateral railroads," for the purpose of trying whether a lateral railroad, proposed to be constructed by George Mulhollan and William Lyon, the plaintiffs below, and defendants in error, was necessary and useful for public or private purposes; and whether the damages sustained by Dr. Peter Shoenberger, the defendant, exceeded $100.

It appeared that George Mulhollan and William Lyon, the plaintiffs in the issue, on the 26th of December, 1846, presented to the Court of Common Pleas of Blair county a petition, of which the following are the material parts:—

"The subscribers respectfully represent that they are the owners of a tract of land in Blair county, having coal-mines thereon, distant not more than one mile from the Alleghany Portage railroad, made by the state of Pennsylvania.   That, intervening between the land aforesaid of your petitioners and the said railroad, is a body of land, in said Blair county, claimed or owned by Dr. Peter Shoenberger; that your petitioners, desiring to make a railroad from their said land over the aforesaid land of said Dr. Peter Shoenberger to the said Alleghany Portage railroad, have marked

and surveyed a route over said intervening land as follows [Boundaries, and courses and distances omitted here] : being altogether, from the intersection of said Portage railroad to the land aforesaid of your petitioners, one hundred and forty-six perches and fifteen links; and prayed the court to allow them to construct and finish a railroad in and upon the route as surveyed and marked, and to appoint six disinterested and judicious men to view and examine the proposed route, and to make report according to law."

Notice in writing of the intention of the petitioners to present the above petition, was duly given to Dr. Peter Shoenberger.

The court thereupon appointed viewers to examine the route selected and surveyed, who reported "*that they did find and deem the same necessary and useful for private purposes,*" and that the damages which Dr. Peter Shoenberger would sustain by the opening, constructing, and completing the road, was $100. From this report, Dr. Peter Shoenberger appealed to the Court of Common Pleas. The court thereupon directed an issue; the material parts of which, considered necessary to be given in this report, were as follows:—

"It is hereby ordered that the said George Mulhollan and William Lyon enter an action upon the case in the said court as of September Term, A. D. 1847, now next ensuing, in the name of them the said George Mulhollan and William Lyon against the said Dr. Peter Shoenberger, and that the said Dr. Peter Shoenberger cause an appearance to be entered for him to the same, and that the said George Mulhollan and William Lyon shall declare, as of the said term, upon a discourse had and moved by and between the said parties of and concerning the said report of the viewers aforesaid, and that the said Dr. Peter Shoenberger, in consideration of a mutual promise on the part of said George Mulhollan and William Lyon to him made, did promise to pay to the said George and William the sum of ——————— dollars, in case they, the said George and William, should make it appear to the court and jury: 1st. That the road mentioned and set forth in the said report is necessary and useful for public or private purposes; and, 2d. That the damages which will be sustained by the said Dr. Peter Shoenberger by the opening, constructing, completing, and using the said railroad by the said petitioners, will not exceed the sum of $100, the amount reported by the said viewers; and that the said Dr. Peter Shoenberger shall plead issuably to the said declaration, so that an issue may be formed and tried by a jury agreeably to the acts of Assembly.

"And it is further ordered, that the circumstances of the said mutual promises, and of the affirmations and assertions laid in the declaration, shall be confessed, so that the trial may be on the merits, and that the costs shall follow the verdict; but the said verdict shall give no title to either party to recover of the other the sum laid in the declaration as the wager."

The declaration filed by the plaintiffs averred that the railroad, in the report of viewers mentioned and described, was necessary and useful for private purposes; and that the damages sustained by the defendant, by the construction and use of the same, would not exceed the sum of $100. To this declaration, the defendant demurred specially. But the court refused to allow the demurrer to be filed, because it was a violation of the form of the issue, as directed by the court. The defendant then filed three special pleas.

The *first plea* denied the averments in the declaration as to the necessity and usefulness of the proposed railroad for private purposes, and as to the amount of damages which would be sustained by the defendant by constructing and using the same. The *second* alleged that the plaintiffs, at the time of the institution of the proceedings upon which this issue was formed and directed, did not own the tract of land containing the coal-mines, nor had they any title to the said tract at that time or since. The *third* averred that the railroad had been improperly located by the viewers, and that it might have been located on ground, so as to have been of private use to the plaintiffs and less injurious to the rights of the defendant. The *second* and *third* pleas were stricken off by order of the court, and the parties directed to go to trial on the issue formed by the *first* plea.

On the trial in the court below (BLACK, P. J.), the plaintiffs read in evidence, under objection by the defendant, the petition presented by them, and the notice thereof to the defendant, after proving its service. This was defendant's *first bill of exception* to evidence.

The plaintiffs then gave in evidence the order to the viewers, and their report.

The plaintiffs then called and examined a number of witnesses, one of whom testified, that the lateral railroad, as proposed to be constructed by the plaintiffs, would be no interference to the defendant in working his mines; that there was no other point in that immediate neighbourhood where the plaintiffs could connect with the state road, without interfering more with

the defendant than it did at the point selected by them; that it was the shortest level on the road, being only about three hundred yards; that then it might be necessary for defendant, when business was brisk, to have more room than he then had, for standing his empty cars; that he was cramped for want of an additional side-track, which would be of easy construction. Another witness testified, that there was no other route, except the one selected, by which the plaintiffs could get out to the state road with their coal; that it would not interfere with the defendant's operations; that all the damage he would sustain would be the loss of his land; and that the defendant was present when the viewers commenced their examination of the ground and proposed route for railroad. Other witnesses, besides corroborating the testimony above stated, testified that the only practicable route for the proposed railroad, was the one selected; that there was no other route over the land of the plaintiffs; that no other could be adopted without injuring the defendant more; and that neither the timber nor land was valuable. The witnesses differed in opinion as to the damages which would be sustained by the defendant, by reason of the construction of the proposed railroad, ranging in their estimates from $50 to $100. It was proved that the plaintiffs were in possession of the ore-bank, and of the tract of land on which it was situated; that they built a two-storied hewn log house thereon, of the dimensions of thirty-two feet by twenty, and a stable also; that the house was begun in October, 1846, and finished in January, 1847; and that it was in actual occupation from the time of its completion. On the part of the defendant, it was proved, that he laboured under great disadvantages for want of an additional side track from his mines to the state road; that the best route for its construction would be on the southern side, where the plaintiffs' road intersected the state road. No evidence was given by the defendant, in relation to the proposed railroad of the plaintiffs, nor in relation to the damages which would be sustained by him from its construction and use. But he offered to prove, that the plaintiffs were not the owners of the land in which was their coal-mine. But the court were of opinion that the title to the land could not be tried on that issue; that if the plaintiffs were in possession, it was sufficient; and that the defendant might prove, if he could, that they were not in possession. This was defendant's *second bill of exceptions.*

The defendant's counsel requested the court to instruct the jury as follows:—

1st. That the act of the 5th May, 1832, and its supplements, have no application to the land described in the plaintiffs' declaration; that there is no law in force authorizing the proceedings which have taken place in this case, and that their verdict ought to be for the defendant.

2d. That whether the act of the 5th May, 1832, and its supplements, be extended to the land described in the plaintiffs' declaration or not, the plaintiffs cannot support the proceedings which have been given in evidence, and have no right to a verdict in their favour, if they have failed to show that they were the owners of the said land, previous to the time their proceedings given in evidence as aforesaid were commenced.

3d. That as the title has not been shown by the plaintiffs to be out of the commonwealth, they have shown no such possession of the land previous to the commencement of their proceedings as the law would recognise, that their verdict therefore should be for the defendant.

4th. That the plaintiffs have shown neither a legal nor an equitable title to the land described in their declaration.

5th. That if the jury believe the land at the terminus of the proposed railroad of the plaintiffs belongs to the defendant, and that the possession of it by the defendant is necessary to the convenient conducting of his own coal operations, the plaintiffs cannot legally deprive him of that possession by the erection of hoppers and other fixtures upon the land.

6th. That the officers of the commonwealth in the management of the Portage Railroad, cannot legally transfer the land of one man, or the possession thereof, to another, except so far as is necessary for the convenient use of said railroad; that the public have no more than a right of way over the land of the owner, and that he cannot legally be deprived of the possession of his land, further than is necessary for the convenient exercise of the rights of way by the public, over his land.

*Charge and answers of the court.*—"This is a feigned issue formed for the purpose of trying whether a lateral railroad proposed to be made by the plaintiffs, is necessary and proper, and what damages the defendant ought to have for the making of it over his land.

"The defendant has asked us to charge on several points of law, which we will take up in their order.

"1st. We are of opinion that the law of 1840, supplementary to this one of 1832, extends the privilege of making lateral rail-

roads to the whole state—consequently we answer this in the negative.

"2d. The law is truly stated in this point. The law does not authorize any body but the owners of lands in the vicinity of the public improvements, to make railroads over the intervening lands of others. But the plaintiffs were not bound to prove title as they would in an action of ejectment. If they have satisfied you that they were in possession of the land on which the coal-mine is, previous to the commencement of this proceeding, they have sufficiently proved their ownership. (Here the court referred to the evidence of their possession.)

"3d. This is already answered. If the legal title was not out of the commonwealth—that is, if the land was not warranted, then the improvements made by the plaintiffs would prove sufficient title for the purposes of this proceeding, if not for all other purposes.

"4th. If you believe the evidence to which I have already referred you, the plaintiffs have shown all the title they were bound to show.

"5th. If the railroad proposed by the plaintiffs would destroy the defendant's improvements altogether, and render his property wholly worthless, I am of opinion the verdict ought to be for the defendant. But will any such consequence result to Shoenberger by the making and using of such a railroad as Mulhollan and Lyon have asked for? It may cause Dr. Shoenberger some inconvenience, but the other party cannot be prevented from coming to market with their coal on account of a shade or two of inconvenience more or less, which it may cause him to suffer. At all events, it is your business to see that he suffers none but what he is paid for. You will make the damages high enough to compensate him for all the injury which the plaintiffs' railroad is likely to do his property.

"6th. We answer this point in the affirmative. The public has but a right of way over the lands through which their road passes. But the commonwealth had a right by its officers to determine when and where a connexion with their improvements shall be made by private individuals. If Lyon and Mulhollan can procure a right of way under the statute over the lands of Dr. Shoenberger, and can procure from the officers of the commonwealth the privilege of connecting with the Portage Railroad, at the proposed terminus, then they will have all they desire—certainly all they are entitled to.

"These answers dispose of all the law in the case. If you are satisfied from the evidence that the plaintiffs were owners of the

coal-mine—that is, were in peaceable and undisturbed possession of it, at the time these proceedings commenced and since, then you will consider whether such a railroad as that asked for, is necessary and useful for the private purposes of the plaintiffs. If this be settled affirmatively, then ascertain what amount of damages will compensate the defendant for the injury which may be done to his property, by the making and using of the railroad."

To this charge the defendant excepted.

The jury found for the plaintiffs, and $100 damages for the defendant, who, thereupon, sued out this writ of error.

Assignment of errors: *In the record.*—1. The court erred by refusing to allow the special demurrer of the defendant below to be filed, and by treating it as a nullity.

2. The court erred by ordering the two last special pleas of the defendant below to be stricken out, and by compelling him to go to trial on the issues formed by the first special plea.

*In the evidence.*—1. The court erred by admitting in evidence the petition, &c., as embraced in the first bill of exceptions.

2. The court erred by rejecting the evidence proposed to be given by Peter Cassidy as to the George John survey (mentioned in plaintiffs' proceedings) and the ownership of the coal-mines, spoken of by the plaintiffs' witnesses, as embraced in the second bill of exceptions.

*In the charge.*—1. The court erred in their answer to the first point put by the counsel of the defendant below.

2. The court erred in their answer to the second point put by the counsel of the defendant below.

3. The court erred in their answer to the third point of the defendant's counsel.

4. The court erred in their answer to the fourth point of the defendant's counsel.

5. The court erred in their answer to the fifth point of the defendant's counsel.

6. The court erred in their answer to the sixth point of the defendant's counsel.

7. The court erred in the conclusion of their charge, in saying —"If you are satisfied from the evidence that the plaintiffs were owners of the coal-mine, that is, were in peaceable and undisturbed possession of it, at the time these proceedings commenced, and since then, you will consider whether such a railroad as that asked for is necessary and useful for the private purposes of the plaintiffs. If this be settled affirmatively, then ascertain what amount of

damages will compensate the defendant for the injury which may be done to his property by the making and using of the railroad.

*W. Forward,* with whom was *Miles,* for plaintiff in error.—The question submitted was whether the road was necessary and useful "for the private purposes of the plaintiffs," thus excluding all inquiry as to its possible utility to any one else.

They contended that a road of this description was not within the purview or spirit of the act of 1832. A reference to some of its provisions must satisfy any candid mind upon this matter. They will be seen to be wholly inapplicable to the road in question. The fifth section empowers the applicant or owner of the road to enter upon any land *near or adjoining* it, and to take therefrom ground, stone, timber, or other materials required in its construction; the rate of compensation to be previously ascertained and settled by the parties, if they can agree, or by arbitrators in the event of their disagreement.

The authority here granted to an individual to seize the property of others and convert it to his own use, is precisely that which is usually given to turnpike and canal corporations; and the mode prescribed for ascertaining damages is the same in principle, if not in words, as that which has regulated those corporations. The sixth section makes it the duty of the proprietor of the road to file in the Court of Common Pleas a full statement and account of the expenses incurred in its construction, the amount to be verified by the oaths of one or more persons who shall have had knowledge of the same. On the assumption that private roads were contemplated by the legislature, this requisition would be ludicrous. But the object in view is distinctly expressed, while it fixes conclusively the character of the road. The filing the account in court is enjoined, *" to the end that the said road, and the privileges appurtenant thereto, may be resumed by the commonwealth whenever the legislature shall enact the payment to the proprietors of said railroad, their heirs and assigns, of the principal money expended in the construction of the same."*

The seventh section confers upon the proprietors the right of exacting tolls for the use of the road by the public—a valuable franchise granted as an inducement to their outlay of capital, but expressly limited, as in the case of aggregate road corporations, so as to prevent extortion.

Every section and provision of the act is in strict harmony with the regulations above indicated. The grant of power is the same as that which had been before repeatedly made to aggregate corpo-

rations for kindred purposes : and in conferring this power the legislature were duly heedful of the fifth article of the declaration of rights, which forbids the taking of private property for public use without just compensation, and of the fourth section of the seventh article of the constitution, which declares that "the legislature shall not invest any corporate body or *individual* with the privilege of taking private property for *public use*, without requiring such corporation or individual to make compensation to the owner of said property, or give adequate security therefor, before such property shall be taken."

It is impossible to read the act without perceiving that the constitutional restrictions upon legislative interference with the rights of private property, were carefully attended to in its passage, and that an intention to authorize the forcible seizure of the property of one man by another for his own private use, cannot be justly imputed to the legislature.   In this instance, as in that of aggregate corporations, the object of the legislature was to invite the investment of private capital in a way that might. be subservient to public accommodation.   The remuneration offered is the right to exact tolls and enjoyment of the other valuable and exclusive immunities prescribed in the act.   Enactments conferring the franchise of tolls for passage over a private road, which nobody but the owner can use, and reserving to the commonwealth the power to resume such private road upon reimbursing the cost of its construction, would seem to be preposterous.   But they are sensible and provident in cases of roads of a public nature, and being expressly applicable to all the roads made under the act, they must be regarded as fixing its construction.

An interpretation of the act which would authorize the taking of defendant's property "for the private purposes of the plaintiff," as charged by the court below, appears to me to bring it into direct conflict with the constitution.   The reasons for this opinion will be briefly and most respectfully submitted to the consideration of the court.

One of the purposes of a written constitution, is a clear, permanent, and effectual security to private property against the invasions of power.   The safeguards provided in our own constitution, are as comprehensive as they are emphatic.   The *first* section of the ninth article, declares "the right of acquiring, possessing, and protecting property," to be "inherent and indefeasible;" thus denying and excluding the exercise of. a right of eminent domain by the legislature, except in the cases provided for in the constitution

itself. One of those cases is found in the tenth section of the same article which forbids the taking of "any man's property for public use without the consent of his representatives, and without just compensation being made."

The prohibitory form of expression used here might be supposed to warrant the idea, that the denial of power was intended to be exceptional, and that private property, except in the instance given, is still left to the arbitrary will of the legislature. But such an interpretation would be inconsistent with the first section, which declares the right of property to be "inherent and indefeasible," and not less so with the last section, which is in these words: "To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government, and shall for ever remain inviolate."

The right of private property, formally asserted in this article to be "inherent and indefeasible," unless required for public use, on payment of its value to the owner, is one of the "things expressly excepted out of the general powers of government," and for ever placed beyond the reach of the legislature: 2 Kent's Com. 340; Taylor *v.* Porter, 4 Hill, 140; Scott *v.* Pittsburg, 1 Barr, 309; Wilkinson *v.* Leland, 2 Peters, 657.

They argued, *First*, that the act of 1832 gave a right, not merely to appropriate the site of the roads, but to enter on lands adjoining, or near it, by whomsoever owned, and "take stone, gravel, timber, and other materials," for building the road. The six per cent. reservation can hardly be said, in the case of a road for "the private purposes" of the party, to cover the extraordinary privilege here given. But the privilege is a necessary part of the system, for no instance will be found in which the stone, gravel, and other materials, on the site of the road, would be sufficient for its construction; and without the privilege of entering upon other lands for a supply, the system would be a dead letter.

The power to subject private property in the neighbourhood to the uses of the road, can only be referred to the right of eminent domain. Such, we are to presume, was the view of the legislature; and if the roads contemplated by the act were not of a public nature, it must be unconstitutional.

*Second.* The act of 1832 and its supplements are in *pari materiâ*, and to be regarded as a whole. The act of March 28, 1840 (Dunlop, 798), makes it lawful for any person or incorporated company to construct railroads with double or single tracks, under the

surface, over intervening lands, &c., to or from any mines of iron, coal, &c., and connecting with any railroad belonging to an individual or company, &c.

The act of May 5, 1841, " extends the provisions of the act of 1832, and the supplements thereto, to the construction of canals not exceeding in width the canals of the commonwealth."

The act of April 24, 1843, sec. 10 (Dunlop, 903), enacts in substance, that when the owners of any railroad possess the landing where it joins any canal or other navigation, and any lateral railroad shall be constructed to connect with such railroad, and the owners of the latter shall refuse to the lateral railroad the use of the landing upon payment of a suitable compensation; a jury of five men shall be summoned, who, if they find the capacity of the landing sufficient to accommodate both roads, shall mark off a portion of land to be allotted to the main railroad, and " fix upon a compensation suitable therefor, either in fee simple or as an .annual rent or price per ton, for the use of the same;" and if the report of the viewers be approved by the court, they shall direct the landing to be opened for the use of the public, &c.

Looking to these several acts as constituting an entire system, it is fair to suppose that they were dictated by the same general views of public policy, and that the authority to provide for the construction of lateral railroads and canals, and securing of landings, were deemed to be referable to the same grant of power to the legislature.   It is already shown that the reservation of six per cent. for roads, in patents, cannot, by any proper construction, meet the provisions of the act of 1832; but when those provisions are extended to subterranean roads and to canals, and when, especially, the seizure of landings to be held in *fee simple*, or at a fixed rent, is considered, it seems utterly impossible to defend *this* scheme of forcibly appropriating private property to *private purposes* upon any other ground or pretext than that of the right of eminent domain.   It results of necessity that the legislature had in view works of a strictly public nature, or that the whole system, applied as in this case, is an assault upon private rights and forbidden by the constitution.

The connexion of private lateral railroads, made under the authority of the act of 1832 and its supplements, with the railroad and navigable waters of the commonwealth, will be found beset with embarrassments of a very serious character.   In the case of Cooper *v.* Smith, 9 S. & R. 32, Judge Duncan says: " There is no right, custom, or prescription in Pennsylvania, by which one

man can land or receive freight on another's freehold on the banks of a navigable river, without his consent, even though it be on a public highway." "It would be a violation of the constitution to deprive the owner of the soil of this right, and the legislature have always carefully guarded against such construction by the most explicit declarations." In Chess *v.* Manown, 3 Watts, 219, the same principle was affirmed by the chief justice.

Our system of exclusive property, guarded as it is by stern and formal restrictions of the right of eminent domain, may have its inconveniences. We find large bodies of land in the hands of men who bought for purposes of speculation, and who refuse to sell but at enormous profits; and thus the settlement of the country and developement of its resources are greatly retarded. Towns, and even cities, are environed by masses of vacant property, owned by persons who will neither sell nor build, whereby the extension of manufactures and commerce, and the countless interests to be subserved thereby, are grievously frustrated. But these evils, if such they be, are inherent in our system of exclusive property, and until the people choose to remodel the ·system, they cannot be reached by the legislature. But were it otherwise, it is questionable whether the remedy supposed to be provided in this instance would not be productive of greater mischiefs than any it is likely to redress. Lands bordering on navigable waters, and other commercial highways, were purchased in many instances at enormous prices, with a view to the advantages of their location. Lands more remote were bought without any such advantage, and at low prices. The effect of the lateral road system, as expounded in this case, will be to sink the value of purchases made, as in the instances first mentioned, and turn the latter into gainful speculations. But a worse consequence than this may be apprehended. Purchases will be made by speculators with no other view than that of forcing lateral railroads through intervening lands, and, this done, of selling out at exorbitant profits.

Unproductive property in large masses may be withheld from sale for purposes of extortion, but it cannot be the interest of proprietors to withhold it for ever. Experience shows that all such schemes of speculation are attended with peril; and we may, at all events, rely on the usual vicissitudes of fortune, and the act for distributing intestates' estates, for a corrective of the evils complained of.

*Orbison* and *King*, contrà, cited Harvey *v.* Thomas, 10 Watts,
N

65; Harvey *v.* Lloyd, 3 Barr, 331; United States *v.* Blight; Act of 7th of June, 1841, Dunlop's Dig. 847.

*June* 12. BURNSIDE, J.—The point was made in Harvey *v.* Lloyd, 3 Barr, 340, that the act of the 5th of May, 1832, Pamph. Laws, 581, Dunlop, 487, regulating lateral railroads, was unconstitutional. This court not only held the act constitutional, but wise and happily adapted to bring on the public works a large amount of business, cheapen the article of coal, which is so essential to the manufactures and commerce of the country, and to every family. The argument that it takes one man's land and gives it to another, is untrue, and a perfect fallacy. It gives only right of way, for which an equivalent is to be paid. It is predicated on the golden rule, that you do to others as you would wish others to do unto you. It is in accordance with, and carrying out the wise provisions of the founder of this state, who gave to every grant six per cent. for roads and highways, which the grantee holds in trust for the public. The reasons assigned on the record of the proceedings to obtain the road, are determined in Harvey *v.* Lloyd; nor are the exceptions to evidence supported. They have been but feebly urged.

The material question seriously discussed will be considered. It is contended that the act of 1832, before recited, does not extend to the county of Blair, and hence the court had no jurisdiction. It is true that the twelfth section of the act of 1832, regulating lateral railroads (Dunlop, 490), restricts its operation to the counties of Lycoming, Luzerne, Schuylkill, and Northumberland. But the act of 28th of March, 1840 (Pamph. Laws, 176; Dunlop, 797, star page), in its first section, extends the provisions of the act of 1832 to the counties of Northampton, Lehigh, and Cambria, and also to the *owner or owners of lands, mills, quarries, coal or other mines, lime-kilns, or other real estate in the vicinity of any railroad, canal, or slack-water navigation, made or to be made hereafter, by any company, individuals, or by the state of Pennsylvania.* The Portage Railroad was made and completed by the state, before the year 1840, and the coal-mines to which the lateral road is desired to be made, are within the distance to the road which the act allows.

It is urged in this court, that the further supplement to the original act of 1832, passed the 12th day of February, 1842 (Pamph. Laws, 18), which extends the provisions of the act of 1832 to the counties of Tioga and Columbia (and is an act of supererogation), reported and enacted without proper examination of the

existing law, as there are no words in the act of 1842 touching the other parts of the state, is in force and not repealed. The supplement of 1842 can only be said to be accumulative in the counties of Tioga and Columbia, and has no relation to the other counties of the state.

There is but one other assignment of error worthy of notice. It is, that the court instructed the jury that if they were satisfied from the evidence, that the plaintiffs were owners of the coalmines, that is, were in the peaceable and undisputed possession, at the time the proceedings commenced and since, then they would consider whether such a railroad as that applied for, is necessary and useful for the private purposes of the plaintiffs. If this be settled affirmatively, then ascertain what amount of damages will compensate the defendant for the injury which may be done to his property by the making and using the railroad. It is contended on the part of the plaintiff in error, that the act of 1832 only gives the right to make a lateral railroad to owners who have a legal title, and that title should be in evidence, and this omission is fatal to the whole proceeding. The original petition to the court stated that they were the owners. They gave evidence that they were in possession of the coal-bank and land adjacent, and had built a square log-house 32 by 20, two stories high, and finished in 1846, and in actual occupation from completion. This was a good, equitable title, subject to all the incidents of a legal estate, and gave the owners a right to build a lateral railroad, under the act of 1832, to their coal-mines.

Judgment affirmed.